Ms. Sullivan. Good morning, Your Honors, and may it please the Court. Kathleen Sullivan for the Appellant Bard. The three Bard patents at issue here claim power-injectable ports that are readily identifiable after implantation beneath the skin through radiographic markers, in the case of the 302 and 022 patents, or by a palpable structural feature, a concave surface, as claimed in the 615 patent. The District Court legally erred by holding the challenged patent claims here ineligible as printed matter. It was legal error, and I need point the Court no further than its own prior decision in the 2020 case of Bard v. AngioDynamics at 979 F3, 1372, to show that this was legal error, and that case is controlling here. I'd like to start with why it's controlling on Alice, Step 1. Can we just start with a couple other questions? We're familiar with AngioDynamics, and we see the correspondence with the facts of this case. For the 302 and 022 patent claims, can you paint a picture for me in terms of what these radiographic markers look like on the claimed port assembly? Yes, Your Honor. The port with a housing? Support with a housing and a septum, so that the port can create a reservoir to allow the injection of fluid intravenously. So the port, what is claimed, is alphanumeric radiographic markers that are opaque to x-rays. So in the x-ray that ports underneath the skin, you're going to inject the fluid into the port. Right. It's the message that I'm most interested in. Yes, Your Honor. What that looks like on the housing. Alphanumeric symbols. I know an example is the letters C-T. Yes, Your Honor. Right. Are they painted onto the housing? Is it some kind of, I don't know, brass plaque that's riveted onto the side of the housing? What does it look like? Your Honor, the key in any embodiment, the key is it's opaque to an x-ray. So whether painted or etched or attached, it's opaque to x-rays. So the point is, the practitioner ... So if you have a chemotherapy patient who's going under a CAT scan, many practitioners will work on the person in the course of the person's treatment. Any practitioner will see C-T pop up because it's opaque to the x-ray. Right. But I'm just ... The inherent nature of radiopaint material, I'm just trying to understand. Will it look like some kind of three-dimensional substance that's somehow attached to, embossed onto the side of the housing? It's on the bottom of the housing, Your Honor, and the point is the C-T will be visible and it doesn't matter whether it's in two dimensions or three because the minute the C-T is observable through the x-ray, you know the port is power injectable. I'm trying to understand if this is a structural element or not. Should I be thinking of this message, African-American message, as a structural element or should I think of it more like what we understand traditionally to be printed matter, which is ink on a page written in words and numbers? Yes, Your Honor. It's absolutely a structural element. We don't dispute that the message conveyed is part of the patent. The patent enables a port to, in effect, say to the practitioner, hello, I'm power injectable, which is very important so you don't blow up the port in the patient's body and cause serious injury. We don't dispute that there's printed matter with respect to the message conveyed. What we do dispute is that the claims are directed solely to the message conveyed. They're directed to the combination of the message conveyed and the structural element, the radiographic markers, that enable that message to be conveyed and that's what makes this on all fours with the Alice step one analysis in the court's prior decision in NGO dynamics. Let me ask you a different hypothetical. What if we had this very port assembly and you took a pen and you scrawled CT on the bottom of the housing of that port assembly? Totally different, Your Honor. That would be printed matter. It would be printed matter. We don't dispute that pure labeling cases, a pure label, a pure stamp on meat would be printed. Supposing the pen contained radio opaque material? Then it would be claimable, Your Honor, because then you're providing the means of conveying the message as part of the claim. Let's assume that standard ink and a standard pen happens to be radio opaque. Then on one hand you're just writing CT on the side of a port. On the other hand, yes, you can see the letter CT when you do an x-ray of a patient. In that sense, I think we already agreed it's printed matter, so why wouldn't that fact pattern be a problem under the printed matter doctrine? Your Honor, that fact pattern would still not be a problem under 101. It might be a problem under 103, but 103, what we'd have to do is... Getting back to the angio-dynamics opinion, I know you want to get back to that. Our court, we made this distinction, this division between the information to be conveyed and then the means for conveying that information. We said the radio opaque material or substance or element is the means for conveying the information, and that is okay, and that is an element that gets passed away. The information to be conveyed does not. Correct, Your Honor. In all our printed matter cases, we've never said, oh, the ink is the means for conveying the information, and so therefore that will get patentable weight, but the information that is being conveyed by the ink does not get patentable weight. As you can see, that's why I am trying to explore with you what would happen if ink in a standard pen scrawled onto the bottom of the housing of a claimed port that happens to also be radio opaque would not suffer from the same problems under the printed matter doctrine. Your Honor, let me give two answers. We're just talking about patentable weight right now. We can get to 101 next. First, still would have patented weight to the extent it's functionally related to the substrate. Now, there might be a question about functional relationship. There's none we believe in our case, but Your Honor, you might have a problem with the pen at 103 if you talk about it as an obvious combination, but the second answer, Your Honor, and this is crucial here, the ink might be observable to the naked eye. We think ink plus printed matter on a label like an AstraZeneca or a number of your prior labeling cases. Ink that's just observable to the human eye, you couldn't turn that into the means that takes you out of printed matter, but these are letters, alphanumeric characters that are not visible to the naked eye, and the means here is the x-ray technology that enables them to be visible, and that is precisely the means that this court found in angio-dynamics was found in. In angio-dynamics, though, the patent was a little different, wasn't it? You had two device patents and one methods patent. Correct, Your Honor, and we only have device patents here. And it seems to me that the analysis in angio-dynamics goes off on the methods patent. It does not, Your Honor. Angio-dynamics with respect goes off with respect to the two apparatus patents on precisely the reasoning we urge the court to adopt here. And, Your Honor, if I could just point, Your Honor, to the 417 patent, Claim 1 in the angio-dynamics case, it claimed a radiographic marker perceivable via x-ray. That's in haec verba, the same as our claims, which claim a radiopac alphanumeric message observable through interaction with an x-ray. How is that patentably different? How is it patentably different, Your Honor? Well, it's the angio-dynamics, we've added alphanumeric message. I want to point out a very important point, Your Honor. Remember our patents that are here also came up to the court. They came up from the PTAB, and this court reversed. And they went back to the PTAB, and I think this is a very important point about our patents. When it went back to the PTAB, Your Honor, they issued certificates of re-exam as to all the relevant claims of all three of our patents, the 302, the 022, the 615, have all been found patentable, Your Honor. So there's a prior ruling, Judge Wallach, that our patent claims here are patentable. It came up to this court, the court reversed the PTAB, it went back, and I can respectfully review it. Did printed matter come up in that? Sorry, Your Honor? Did printed matter come up in that? It did not, Your Honor. It did not, and this court reserved on that question. But the point I'm making here is, Judge Wallach asked me how they were patentably different. The PTAB has already found patentability. We give you the opinion there in the blue brief at page 11, footnote 1. So I was just trying to take care of Judge Wallach's question, Judge Chen, to come back to your question. Our key point here is that means, when the means is the claim, and the means is part of what makes the patent a contribution here. If I could respectfully, Your Honor, I believe Your Honors have already found, if you look at page 1384 of the NGO Dynamics decision, that it was an addition to knowledge, that it was an addition to knowledge, that what made it practically useful here was that these letters that are etched on the housing were perceptible by x-ray. That is an addition to knowledge because it makes it readily identifiable. You just said etched, and again, I'm struggling with figuring out how to understand in my own time what these radiographic messages look like. Your Honor, in the embodiment in the figures in the patent, it shows them as inscribed. I don't think it matters whether the embodiment is painted, etched, inscribed. The point is it's opaque to an x-ray in any means, in any variation on that means it's opaque to the x-ray. But Your Honor, if I could just point to what I was quoting from page 1384. What this court said makes the patent particularly useful is that the radiographic marker in the claimed invention allows the implanted device to be readily and reliably identified by x-ray as used during a CAT scan. So Your Honor, what is the means here is absolutely part of what the invention is about. We think we went also at step two because that is an inventive concept. There were no power injectable ports. Let me just ask you this, and I know we're bound by angiodynamics and it looked at it under the Alice rubric, but why is the Alice rubric relevant to a printed matter case? Alice has been used to talk about abstract ideas and laws of nature and things like that. Printed matter has always been used in 102 and 103, not 101. So it baffles me why we're talking about printed matter as an implicit exception to patentability under 101, and the analysis just doesn't seem to fit to me. Well, Your Honor, that issue was raised and decided by angiodynamics. Well, I know, but let's just assume, I'm just interested to hear what you have to say about that. Let's just assume angiodynamics does not exist, and we were the first panel trying to decide whether to apply Alice to printed matter. Yes, absolutely, Your Honor. What's the rationale for applying it? It seems like then it turns every patent inquiry into this 101 thing is what's the inventive concept and then apply the Alice step two, the two-step thing, but that's not what Alice in that line of cases is for. They've been generally confined to abstract ideas and laws of nature, haven't they? Your Honor, I think that if I could just go back to ENFISH, the connection is through the concept of reading the patent claim as a whole, which of course was this court's very important piece of the ENFISH holding. To read it as a whole, I think in a way angiodynamics just applies ENFISH because it says, read the patent as a whole. All right, it's got some printed matter. We accept that the message, hi, I'm power injectable that's coming from the port. We agree that message might fit the old definition of printed matter in the 102, 103 cases, but the key thing angiodynamics does, just like ENFISH, it says read the claim as a whole. As a whole, this is claiming a means, a structure, a port, radiographic markers that are structures and they're not perceptible. I get that and that's what angiodynamics says in terms of it, but you didn't really answer my question about why we're even looking at this in terms of 101. I'm sure you've read ENFISH more recently than I have, but I don't recall anything about printed matter in that case. It was an abstract idea case. Absolutely, your honor. And we would, and can I also just mention that in angiodynamics itself, angiodynamics raised a number of abstract ideas, arguments based on secured mail and other cases in this court squarely rejected them. There was angiodynamics considered but rejected any abstract idea analysis. I think, your honor, that there's a serious question whether printed matter ever should have been incorporated into the 101 analysis, but now that it's law of the circuit, I think it is reconcilable with your Alice precedence because it's a variation on ENFISH. Look at the claim as a whole. When you look at the claim as a whole here, it claims structures, means, not just the message conveyed. And that's all you need to reverse at Alice step one. Can I just ask, we've got this litigation, we've got the litigation with angiodynamics, and then we have yet a third litigation with Judge Nielsen. Correct, your honor. And everything's been stayed pending the court's resolution of this matter. And are all those patents related patents? Yes, your honor. So we have a proliferation of patent claims about radiographic messages on the side of an old, well-known port assembly? Oh, your honor, just to recall. And as you just helpfully showed us, all the claims have no material difference among them? Your honor, I want to be sure I reserve time for rebuttal. May I answer your question? You will have rebuttal time. All right. Thank you, your honor. Yes. Look, BARD invented power injectable ports. It realized that they had to be identifiable so you didn't harm patients. You have to be able to identify in the moment that they're power injectable. That's what the FDA wanted. We were the first to get FDA approval. The patents are related, your honor. But we think you can simply dispose of this case. It's an easy reversal after angio-dynamics because the patents, as in angio-dynamics, claim means of conveying the information. And it's not your pen case because they're not observable to the human eye. You need an x-ray or you need palpation. When you say it's not observable to the human eye, you don't think the CT on the bottom of the housing of the port assembly is seeable? Absolutely, your honor. I'm sorry, your honor. I don't understand what you mean by it's not seeable to the human eye. After implantation, your honor. After implantation, which is claimed. So the key thing here is we're not talking about letters on the outside of a box. We're not talking about use instructions in a prescription drug institute. So supposing your method patent started with the words, take a scalpel, but you don't need the x-ray. You just cut open and read what's on the bottom. Well, your honor, the contribution to knowledge here was to enable, you know, ports keep patients from being turned into human pin cushions when they go through multiple injections. Anyone who knows people who have gone through chemotherapy knows that. And this enables that subcutaneously inserted port that protects the patient to be reliably identified as power injectable. That is capable of withstanding injections at a high rate of flow, mechanically assisted, that won't shatter the port and harm the patient. So your honor, with respect, I don't think that the application that means cutting the patient. But the surgeon could read that marking on the port. Your honor, these are interesting questions, but angiodynamics, unless this panel were to try to reverse the prior panel decision of the court, decided this question. There's no material difference between the apparatus patents here. We could distinguish it, or we could ask for an in bank. Well, your honor, I don't think there's a way to distinguish it because, and I want to, if I could highlight one feature of the district court's opinion, I want to focus on the step one legal error. The step one legal error is at appendix page 17, where the court said, I am going to read the means as well as the message as part of the printed matter. That's directly contrary to angiodynamics. And then at the appendix page 28, footnote 138, the district court acknowledges and admits that he's bound by this court's precedent. And his decision is in tension with this court's precedent. But he nonetheless is going to distinguish it, because he said there are different records in the case. But your honor, that's obvious legal error, because the only record before you at Alice step one is the claims. The claims which you, and you review the interpretation de novo. My last question is, was it already known in the art to apply radiopaque markers to other medical devices? No, it was not, your honor. And again, Angie, I dispute that, that you, so BARD was the first one. Oh, I'm sorry, your honor. No, no. I'm talking about any medical device. The medical, absolutely it was known. I'm sorry, your honor. Okay. It was known in the art with respect to other radiographic markers on other medical devices. Yes. I'm curious, what, can you just explain to me why it wasn't obvious to just go ahead and apply these well-known, super basic radiographic markers to the well-known, super basic known port assembly? Well, your honor, first, obviousness is down the line. We haven't done 102 and 103 yet. I understand, I'm just not sure it's been answered, because it occurred to me. Here's why, your honor. And again, this was decided by Angeo Dynamics. Remember, Angeo Dynamics has the alternative step two holding. All the same prior art with respect to radiographic markers in medical devices, defibrillators, pacemakers, surgical swabs and sponges. Yes, of course, radiographic markers existed in other medical devices, but there was no port prior art in- There's no 102. I understand that. Yeah. There's no port prior art. Yeah. And in fact, the port one decision, remember the PTAB found patentability for all three of the claims here. We cite that in the blue brief at page 11, footnote one, if you want to see the PTAB. We got re-examination certificates. So there's no question. And the re- Your honor, if I could just sum up my answer to your question in one phrase. Ordered combination of the elements. So ordered combination of the elements, a phrase that goes all the way back to Mayo. Ordered combination of the elements is what you look at at step two. And the ordered combination of the elements here wants you to look at ports, not defibrillators. And it wants you to look at radiographic markers to identify subcutaneously implanted ports and not other kinds of devices. And there was no port prior art. This court had before it the patents that had radiographic markers to show flow rate, radiographic markers to show whether the port was upside down. But those are not ordered combination of the elements here. Power injectability is key to that. And so this court could affirm on step two under Angio Dynamics, no material difference in the record. Judge Wallach, you can't distinguish the prior art record here from the one before the court in Angio Dynamics. There's nothing new that's port specific. But your honor, you don't need to do that. The court can reverse simply at Alice step one under Angio Dynamics. Thank you very much. Thank you. We'll reserve your rebuttal time. Thank you, your honor. Let's hear from the other side. And let's go to 20 minutes. You don't need to use it all, but you'll have 20 minutes. Thank you, your honor. Thank you, your honor. Pleasure to be before you. May it please the court. And I will reserve one minute of time for the rebuttal. Yes, of course. The patents in this case are not to a power injectable port. I'm sorry. Could you just start right away with angio-dynamics and explain why this is not a carbon copy of the angio-dynamics case? Those claims, that reasoning, why aren't our hands tied here? Well, the patents in the angio-dynamics case claim specifically to a power injectable port, in all respects, it's a traditional apparatus claim structure. We have a traditional apparatus claim here. It does claim a port assembly. In Port 1, our court construed these claims in front of us today as being a power injectable port assembly. So I don't think your identification of the other claims in angio-dynamics as actually referring to a power injectable port assembly really makes any difference. Well, in Chief Judge Shelby's analysis, he considered that very carefully. And it clearly is directed to a power injectable port functionality. But it speaks to the message. It's information that is being provided by the patents in our case, different family, different family line. It provides three specific kinds of things. In 302, they refer to it as the radiographic alphanumeric characters. It's not a structure. Radiopaque alphanumeric message. I don't know what structure a message can be. A radiopaque identification feature, principally used by shape. These things are the printed matter. Printed matter, the suggestion that you can separate the matter from the printing would viscerate, as the court said in angio, the doctrine. Wait, are you saying we said that? No. No, we didn't. We said the opposite of that. Angios. There's this court in angio dynamics that there's a distinction between the information to be conveyed by these radiographic alphanumeric messages and the means by which you convey the information. And here, in angio dynamics, just take it as a given that we held that that was sufficient to be directed to something that is not an abstract idea, that is not printed matter. Because we split that claim limitation into number one, the information being conveyed, and two, the means for conveying that information. Okay. And Chief Judge Shelby also addressed that. And he harmonized that language to mean that, excuse me, which one? Quoting angio, the court said, a conclusion that near identification of a device, device's own functionality is sufficient to constitute new functionality for purposes of the printed matter doctrine would eviscerate our established case law that simply added new instructions to a known product. Does not create a functional relationship. So here, here you have the radiopaque. In our case, it's radiopaque alphanumeric characters. What is their relationship to the substrate? There is none. In order to have a relationship, it has to affect the primary purpose of that claim, which is power injection. Radiographic characters are, it's a property. So you can see it under x-ray. It makes things visible under x-ray. That's all it is. Density of material. High electron compression, where you have a lot of density to take on. And we said in angiodynamics, that's good enough to say that the claim is passed muster under 101, and we reversed. But I think we're having a disconnect perhaps in this conversation. I think we are. The radiographic marker itself is not a functional element of the port. It provides information about the port. It provides old information about the port. It's the only means in which you can provide that. I'm a little confused. I mean, the radiographic marker is structural. You have to either etch it or do something to make it visible, right? No. Well, then where does it come from? It doesn't just magically appear. Somebody does something to the port to put a radiographic marker on there. The information it conveys may be printed matter, but the radiographic marker itself is structural. It is, but it's not structurally related to a substrate. The substrate in this context is power injectable port. It doesn't make the port function any differently. If you remove it, it's the same port. The purpose of the port is to provide higher volume of material through the port by higher pressures and flow rates. That radiographic substrate has no impact on that. It has nothing to do with it. It simply says you can use this device for that. Do you have a copy of that angiodynamics opinion? I do. Can you go to 1384? Yes, sir. A little bit down from the top, there's a sentence that says, when each claim is read as a whole. When each claim is read as a whole, yes. The focus of the claimed advance is not solely on the content of the information conveyed, but also on the means by which the information is conveyed. Yes, that's correct. And then went further to say these radiographic markers, you know, therefore make the claims patent eligible. So what do you interpret the meaning of this one sentence I just quoted as referring to? This would be correct if, as an exception that was noted, that if it's related to the substrate. The substrate in this context, just because it's affixed to it, isn't enough. It has to be functionally related. It's not structurally related. It's functionally related. It has no functional relationship to the port. The port provides fluids at a higher rate of volume and pressure. Do you think we required that in the angiodynamics opinion when we found those claims to be patent eligible? I think Chief Judge Shelby, in his opinion. I'm asking you about our governing Federal Circuit case law. I think the case law, it has to be read in the context of all of your prior decisions. And in your prior decisions, you should. Angiodynamics is pretty much the closest, most relevant case to the present case. Would you not agree? I would. But I would say it does not reverse the other cases. It can't. You have to harmonize them, don't you? I think you have to look at what the intent was. Now, let me take a step back. I don't understand that. I mean, this case is talking about the exact same things, and the other cases aren't. So are you suggesting that somehow this case is inconsistent with our prior precedent and we should ignore it? No, you should ignore it. I think it creates the impression that it's inconsistent. I mean, frankly, I think the whole analytical framework in Angiodynamics is nuts, using this printed matter doctrine in an Alice inquiry. I don't understand how we got there. Printed matter has always been in 102, 103 cases. So if you think this case is wrong, then I would just disregard it altogether. But clearly, we're bound by this. And this is talking about port assemblies. I don't know where we're talking about anything else when this is the case that's on point and it is binding, and it clearly found these kind of structures patent eligible. I don't get where you're saying that the radiopath, whatever it is, has to be part of the substrate. Where in our case law does it say that, particularly in this Angio case? Well, as was stated, in the printed matter doctrine, if the printed matter is the only thing that remains to support patentability, it's ineligible under that basis. Yeah, that's what we said in this case. Most of the time, maybe there's another straight case out there on that. Almost all the times I've seen printed matter, it hasn't had anything to do with eligibility. It's had to do with either anticipation or obviousness. And you can't distinguish a prior reference by just adding an instruction manual. That doesn't get you out of anticipation by saying, oh, here's an instruction manual on how to use the patented bike. You don't get it. Right. I understand that. May I address your point on the printed matter doctrine and why it was said to be under 101? The Alice doctrine says that if you find that the claims advance, if you will, is an abstract idea, it is within the confines of Alice. And I think what happened is they found that the printed matter itself provides information. Oh, I understand. That's why they did it. It just seems bizarre to me because we never used printed matter that way. But we're stuck with it. We are. But you're stuck with it, too. I am. You don't get to read it a different way based on all these other old printed matter cases that were used for a different purpose. And so what they looked at in Andrea Max that we're talking about is the whole thing and said, this is directed to a port with all these different features, and that's enough to make it patent eligible even if a small portion of it, the printed matter, is ineligible. Why isn't this case on all fours with that? Well, printed matter itself, it is printed matter. The printed matter, in this case, is visible. The claims here aren't just to the printed matter, though. Every single one of them is to a port assembly, aren't they? No. In this instance, in our case specifically, these claims, we should look at a claim, is directed to information from the claim. Looking at claim one from this patent. I'm sorry. No, okay, so you're going to look at this one. The claim itself says it's to a port assembly. Yes. What you're saying is that the claimed advance here is information. Yes, exactly. But that's the same thing that was in Andrea Max. And we said you can't just look at the claimed advance. You have to look at the thing as an order combination under Alice, and it's to a port assembly. So it's eligible. When you look at the claim as a whole, everything in that claim is known in prior art. But that makes it obvious. It doesn't make it ineligible. In Angio, it said that if the advance, you look at the claimed advance. What is that claimed advance? The claimed advance is the provision of information by this element that is not related to the substrate. It's not related to the port assembly. It's related to the provision of information. It's providing the rate of opaque material has nothing to do with the port. You take it out, it runs the same. You put it back, it runs the same. It's not structurally related. It's to the substrate. Wasn't that true in the prior decision? Which prior? We're talking about Angio Max, Angio Dynamics. Yes, that's why they said the printed matter doctrine. But yet we still held it eligible. This is what I don't understand. It's the exact same stuff. Can you walk us through why the Angio Dynamics claim is patent eligible, but these claims are somehow different from those claims and therefore ineligible? I'll just let you know right now. I don't see any difference. Okay. In the case of the – in the Angio Dynamics case, the call of the claim, the claim focuses on the power injectable port, which, by the way, has been in existence for a very long time. It wasn't invented by Bort. But here they're claiming a power injectable port. Let's see. We'll look at the 417. The 417 patent is an assembly for identifying a power injectable port, access port. A first identifiable feature having a first access port, the first feature identifying the access port is suitable for flowing fluid at a fluid flow rate of at least one milliliter per second. Second identifiable feature to the access port perceiving – sorry. At least one milliliter per second through the access port. A second identifiable feature incorporated into the access port, following subcutaneous implementation. And then it refers to the cavity at at least 35 PSI. This is an apparatus claim that claims the function of the port through its physical properties related to the port structure. There's no discussion here in this claim. This claim does not explain any relationship of the radiopaque material, which has nothing to do with any of that. So the radiopaque material then is used for – You're still talking about the angio-dynamics claim, right? That's the angio-dynamics claim. So now we go to – we'll look at the claim in the case here. And wasn't – okay, never mind. Keep going. Aren't the identifiable features in this angio-dynamic, when it talks about first identifiable feature, second identifiable feature, isn't that printed matter? It is printed matter, yes. But it is also – it is also – I'm sorry. Maybe I misunderstood your question. You say it again. The first identifiable feature? It's printed matter, right? The angio-dynamics patent has – it's a port, and then it has these features that tell you what the port can do. You say those features that tell you what the port can do are not – are what makes it not eligible. Yes, that's correct. I mean, the angio-dynamics one, but we found it eligible, and that's the claim to advance there too. I mean, it's the same thing. I think it's a vascular access port, which you say – I mean, everybody agrees. Nobody's – none of you have invented that. And then what's changing it or what's making it eligible or what's making it different from the prior art is these identifiable features. If your argument holds true for the patent we have here, then it should have held true for angio-dynamics patent. Most likely. But we can't overrule that. It may be an en banc situation. Let me try this. We're not taking this case en banc. Let me try this on you. Certainly. Go ahead. Angio-dynamics draws a distinction between the printed matter, the radiographic printed matter, and the means used to convey the information. Right. Because it was – and there the court was referring to means as process or method. They were analyzing two device patents and one methods patent. The methods patent specified the use of venous port assemblies as compatible with CT scanning requirements. And the court's description of means, quoting that, refers to its finding that the claimed invention, now in quoting, makes the claimed port particularly useful for the purpose of CT scanning because the marker allows the implanted device to be readily and reliably identified via x-ray as used during CT imaging. This doesn't mean that means means the material, materiality of the radiographic marker material itself, but rather the process through which it's used and useful in the context of a methods patent. But there's no methods patent at issue here. I think that's your distinction if there is one. Well, certainly the 639 patent is what you're referring to. And certainly there's a distinction between the method patent and the apparatus. We have in our case here, in the MedCom case, apparatus claims. And addressing those apparatus claims, you have to take it in the context of all of your precedents. And I would agree with you that the latest case, the Angiot case, creates what seems to be a conflict with the traditional use of the existing, understandable... I don't understand why we're here, frankly. I don't understand why this isn't a question of obviousness about whether the print and matter doctrine, which is some of these claims seem to contain print and matter, whether that, once excluded, makes these claims obvious or not. Do you have a 103 challenge? Yes, we do, sir. We haven't spoken about ALICE at all. That's fine. Unfortunately, we're out of time, but we have it all in the briefs. But could you just tell us about your 103 challenge? Is it basically the idea that it was already well-known to add radiographic material to implanted medical devices? Yes. And the claimed medical device here, at least structurally, is all known elements, and so, therefore, skilled artists would be likewise motivated to add alphanumeric radiographic material to the side of a port assembly? Yes. And we have all of that. It is exactly that, I think, you said. So if this were to be remanded, I guess you would try to go for summary judgment on that? Absolutely. Okay. If I may just say one thing. The thing about the contention between Andrew Nam's case and this is that what that radiographic marker is doing, all of this doing, is telling you what the port could do. It's already what it has as a thought here, that you should not allow, in our case at least, the printed matter doctrine that you said is per se abstract. That's the reason why it was put on the analysis list. We think it's printed matter that's providing the functionality that they're claiming. We have your argument. Thank you very much. We'll give you one minute for your rebuttal. Thank you. Thank you, Your Honors. Three quick points. Obviousness is not here. BEDCOMP did not move for summary judgment on obviousness. I think you're going to say no, but I could not follow at all the distinctions between those patent claims we looked at in our prior case and the ones you have here. They're a little bit more detailed about the information that's being conveyed, but isn't it the same information? It's exactly the same information and it's exactly the same means. So the two apparatus patents at issue in NGO Dynamics, the claims are indistinguishable, materially indistinguishable from the claims here. And the claims here, remember, as to NGO Dynamics, were already upheld as non-obvious by the Patent Office. So, Your Honor, indistinguishable from NGO Dynamics. It is on all fours and it does control. Second, I appreciate Judge Hughes' oddity of importing the 102-103 use of unpatentable printed matter into the 101 inquiry, but I think what the Court tried to do in NGO Dynamics is reconcile printed matter with Alice by what we talked about earlier, claims as a whole. And the key holding of NGO Dynamics is not... Well, I understand why they... I mean, I can read the case and understand it, but we get enough criticism for expanding 101 into everything. I don't understand why we're expanding it into printed matter. Understood, Your Honor. But here, it's easily resolved because this is not solely directed to printed matter. Not solely directed.  These are means, whether they're etched, Your Honor, whether they appear on a raised plate, whether there's a use of radiographic ink, all of which are embodied... If it was solely directed to printed matter, we wouldn't even need Alice, right? Because it just wouldn't be statutory. That's exactly right, Your Honor. A hundred percent. That's exactly right. Just a quick word. Mr. Zayer spent a lot of time on no functional relationship. I want to point out that we win under 101 under NGO Dynamics, even if there is no functional relationship to the substrate. NGO Dynamics found no functional relationship to the substrate and still found patent eligibility on the ground that it was not solely directed to non-patentable printed matter. And, Your Honor, last point. You asked whether the prior art had... The key distinction on the prior art is the prior art didn't have. Any power injectable ports using radiographic markers. None. And don't take it from me, take it from the PTAB, because they found each of these three patents patentable over re-examination in the re-examination... The re-exam requester did a flawed job. I'm sorry, Your Honor? Nothing. The cross appeal, he's going to get up and... Yes, Your Honor. The judge said law of the case, so it wouldn't really be that objectionable if we were to reverse in your favor on the appeal to likewise at a minimum vacate and remand on the cross appeal given that there really wasn't any independent reasoning on the other side's patents. That's correct, Your Honor. We think you could affirm for... And you could affirm, but we would also accept that you should vacate and remand for instructions to use the proper reasoning because the reasoning is identical. Okay, thank you. Just on the cross appeal. On that last point, we think it's more than reasonable that if patents covering the same things are eligible, they're all eligible. If they're not eligible, they're all ineligible. We've never taken an opposite position that one company can have the same claims that cover pretty much the same scope being different... In the future, it might behoove you to provide more than one paragraph on your argument, particularly when you concede that the patents are somewhat different. Right? I mean, one paragraph doesn't really tell us why you think you should win your cross appeal very much. In certain circumstances, if you don't give us an argument, we find it forfeited. Would you say that your claims in your patent are really overlapping subject matter with the claims in Bard's patents? Well, they claim to a port with a radiographic identifiable markers. Right, they're both claiming the same thing. Seems like PTO should have provoked an interference here. Well, there was an interference. There was an interference? It was a priority contest. You're at first to invent patent and they're at first to invent patent? There was. And then the PTO shot both patents out the door? Well, I honestly can't remember. Never mind, it's okay. We have your arguments on the cross appeal. Thank you very much. Case is submitted.